# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00744-CR

---

**James Craig Keen, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
### NO. CR-16-0558-D, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

James Craig Keen shot and killed his girlfriend, Erin Wright. A jury convicted him of murder, *see* Tex. Penal Code § 19.02(b), and it assessed his punishment at life imprisonment and a $10,000 fine, *see id.* §§ 12.32, 19.02(c). The trial court entered judgment on the jury's verdict and punishment assessment, including making a deadly-weapon finding. In nine issues on appeal, Keen contends that (a) his constitutional rights were violated by the admission into evidence of jail-call recordings with his father and (b) the jury charge erroneously authorized a murder conviction based on a felony-murder theory whose predicate felony was reckless aggravated bodily-injury assault. Because he did not preserve his jail-call complaints about the recordings that were admitted into evidence, because another of the recordings was not admitted into evidence, and because the charge error did not egregiously harm him, we affirm.

# BACKGROUND

Keen and Wright had a romantic relationship for some time. They each had children from other relationships—Keen a daughter, Leah—and then had a daughter together, Daisy. When Wright was pregnant with Daisy, the police responded to a domestic-violence call at Wright and Keen's home and saw Wright "crying uncontrollably" outside. She said that he had slapped her and knocked things out of her hand after ordering her to pack and move out. After the police showed up, Keen stood on the front porch and was on his cell phone telling someone on the other end, "I fucked up" and "I slapped her." Officers escorted Wright back inside so she could pack and saw the home in disarray with damage everywhere. A glass-top coffee table was smashed, glass was all over the floor, the dining-room table and some chairs were damaged and spread everywhere, an accent table was damaged, and other items were strewn about. Keen admitted that he caused all the damage, and Wright subsequently moved out of state.

After several years apart, Wright moved back in with Keen and Leah, along with another daughter of Wright's with another man, Abby. Leah and Daisy were ten years old and Abby six. Shortly after Wright returned, the relationship again turned volatile, culminating in an argument throughout the home on Easter 2016. Meanwhile, Leah kept to herself in her room, and Daisy ran outside. Abby, while Keen and Wright argued in the kitchen, clung to her mom's hand.[1] Keen demanded that Wright and her daughters move out. So contentious had the relationship become that Keen had recently told a longtime close friend that Wright "was a 'dead bitch'—a 'walking dead bitch,' she just didn't know it yet." Another time, as he told the close friend and

---

[1] Keen disputes this. He testified during guilt–innocence and said that Abby was not holding her mom's hand but was nearby enough to watch what happened but not too close because he did not know she was there. The jury, as will become clear below, did not believe him.

after another argument between Wright and him, Keen went to his room and "raised" his shotgun but put it away before doing anything else.

In the kitchen, Wright threw a glass on the floor, and it shattered. Keen fetched a handgun from atop the cabinets, and it had a round already chambered. Abby did not feel like Keen was afraid of her mom. Still, Keen aimed—exactly where, the evidence conflicted—and shot Wright in the upper chest. She went outside and collapsed in the driveway. The bullet had perforated her aorta, and she shortly died from blood loss. Daisy hurried to neighbors' houses for help. At the third house she tried someone answered, but by the time Daisy started returning to her mom, a married couple who had been driving by had pulled over, gotten out, and called 911.

A woman from the couple saw Abby crying, felt Wright's faint pulse, and saw Daisy come back from up the street and Leah come outside. She also saw Keen emerge and heard him on the phone saying, calmly: "She wouldn't leave. She wouldn't get out. Come get the girls. I shot her." He was talking to his father, telling him that "there had been an accident and there had been a shooting" and to get the children because "he was going to jail." Before this, at about 7:50 p.m., Keen had called 911, saying that there had been a shooting, help should hurry, and "she wouldn't leave" and quickly hanging up. The woman looked at Keen but saw no injuries on him and never heard him say that his life had been in danger or anything of the sort. He tossed his phone to the woman's husband, asking him to talk to Keen's father, then raised his arms "like he was surrendering." The husband also saw no injuries on Keen. Police and EMTs arrived and realized that Wright was dead. They put the three girls into an ambulance, and officers handcuffed the "agitated," "angry" Keen and began investigating.

Officers searched the home and interviewed Keen after reading him his *Miranda* rights. He told a detective that Wright had chased him around the home and threw things, he

3

locked her outside but then let her back in after she tried kicking the door down, he felt scared, there were broken items in the kitchen, and then he grabbed the handgun. He did not mention a warning shot or warning Wright in any way before he fired the handgun. And upon searching the home, the detective saw no evidence of anyone's having tried to kick the door in. The officers and EMTs also noticed Keen's size—roughly 6′3″ and 235 lbs.—which was "a lot bigger" than Wright's—confirmed at the autopsy to be 5′6.5″ and 148.5 lbs. Officers inspected Keen's body and took pictures of him. He did not show any injuries, including no cuts on his feet, and did not complain about any. One detective saw no cuts, bruises, or other injuries on Keen or "anything that would have led [the detective] to believe that" Keen "had been in some kind of assaultive exchange." Throughout the interviews, Keen never expressed that Wright had hit or scratched him or that he thought his life had been in danger. The officers booked Keen into jail that night.

During his time in jail, Keen communicated with his father and the close friend. He talked with the close friend about the shooting. Keen relayed that his relationship with Wright had "been adversarial throughout the years and caused him a lot of resentment towards her" and that leading up to her moving back in, the two argued a lot and struggled to get along. He "despised" her and called her "the devil's spawn." The friend had mixed emotions about Wright's and the children's safety because the friend had known Keen to be, "kind of, a hot head and has problems getting along with folks" to the point that the friend had heard a "lot of threats come out of [Keen] over the years" that the friend "didn't know whether to take . . . real seriously or not." The friend even once warned Keen to get rid of all his weapons. Keen admitted to the shooting and expressed no regrets about killing Wright. In the friend's telling, Keen "took complete ownership of it" and said that "it was fate, that that was supposed to happen," and

4

that God creates some people for destruction and other people for righteousness and that [Keen] was one that God has chosen his method and weapon of destruction and that he was finally at peace with what had taken place and . . . everything was good that that happened and he was OK that it happened.

In fact, Keen explained to the friend "that he was acting on behalf of God and eliminating the evil from this world and that [Wright] was evil." But Keen never mentioned to the friend anything about defending himself from Wright.

Keen was indicted for murder, and the case was tried to a jury. He put on a case-in-chief and testified. He said that he and Wright got along well and talked regularly before her move back to Texas. But things grew "stormy," and the relationship "rocky," once she moved in. He said that he would argue with her about her drinking and that she was erratic and unpredictable when drunk, bouncing between calm and excited or belligerent.

He also offered a version of the events leading up to the shooting, one often at odds with Abby's. He said that he and Wright's argument began around 7:30 p.m. after he had been working on his taxes all day without eating. After Wright got home from shopping, the argument began with her "yelling at Leah over a conflict Leah and Daisy had." "[A]t that moment," Keen said, "I realized that [Wright] was inebriated," so he politely told her, "I'd like for you to leave." She reacted with hostility, screaming at him and getting "right in [his] face." She chased him through the home, and though he locked himself in a bathroom for a time, she kept antagonizing. After growing more "agitated" and "aggressive[]" himself, he demanded that she leave, and she went outside. He locked the front door, but she "started kicking the door and screaming that she was gonna kick the door down," so he let her back in. She resumed yelling in his face, so close that "she was invading [his] personal space," and though admittedly much larger than her, he felt

5

"threatened" because she was in such "close a proximity," which he called "threatening in itself." She even "bumped into [him] several times," "trying to get [him] to strike her."

He "retreated to the kitchen," she collected her keys and purse and followed, and he "grabbed the firearm from above the cabinet." At no point, he admitted, did she have a deadly weapon. Although Abby testified that Keen climbed on the counter to grab the gun, Keen testified that he could reach it standing on the floor. And although Abby testified that when Keen fired she was standing beside her mom, still holding her hand, Keen testified that Abby was farther away.

He and Abby also disagreed about how he aimed the gun. She said that he aimed it at Wright and fired and when asked to clarify, said, "I'm pretty sure he—he aimed it at her. I really don't know if he aimed it at her, but I'm pretty sure he did." But he gave a different, longer explanation. He admitted grabbing the gun before Wright threw anything at him in the kitchen. He grabbed it "to let her know I'm very serious, you need to leave." Then "while she was throwing things at" him, he said, he "was pointing [the gun] at her," "straight at her" at first, "trying to scare her out." He said that she threw three plates, two glasses, and a ceramic figurine, with the figurine hitting him in the chest and one of the plates cutting his ankle but leaving only a "shallow" cut. He "brought [the gun] up," and "then at the last second" he "tried to fire a warning shot up and over her" into the wall to "get her to leave" but "was not aiming at her" and did not intend to shoot her. Instead, he surmised, the bullet came "down from a sharp angle" to hit her.

During cross-examination, Keen was confronted with officers' testimony, and photos and video from their search of the home, that conflicted with his account. To explain why no one found the broken plates that he described, he testified that the plates had to have been cleaned up before the officers conducted their recorded walkthrough and that the officers might have cleaned them up "[t]o embellish." He offered more testimony on this topic of his memory of

6

the home versus the video of the officers' search. He asserted that officers moved furniture from one room and that he heard them doing it while he was sitting handcuffed outside on the curb "for almost eight hours." He said that officers also must have moved a table, planted a plate of apple slices, and planted blood spots. He continued by affirming the prosecutor's statement that "somebody came in and just rearranged [his] house as he or she [th]ought fit to embellish a crime scene," including removing broken pieces of the figurine. He admitted that he did not seek medical attention for the cut on his ankle and said that it was caused by one of the broken-plate shards that someone must have hidden away from the crime scene. Keen ended his testimony by admitting that how he had handled the gun when attempting the "warning shot" was both negligent and reckless.

The State called as a rebuttal witness the officer who took Keen to jail for booking. The first 911 call, Keen's, came in about 7:50 p.m. But although Keen testified that officers kept him handcuffed outside his home "for almost eight hours," the rebuttal officer explained that he arrived with Keen at the jail for booking around 11:00 p.m.

After the evidence closed, the court submitted to the jury murder, manslaughter, and criminally negligent homicide. It also instructed the jury on self-defense. The jury found Keen guilty of murder. After hearing punishment evidence, the jury rejected sudden passion and assessed punishment at life in prison and a $10,000 fine. Keen now appeals.

## DISCUSSION

### I.      Keen did not preserve his complaints about a recording of one of his calls from jail with his father.

In his first three issues, Keen contends that the trial court violated his Sixth Amendment right to assistance of counsel by admitting into evidence an audio recording of a phone

7

call between him and his father that took place while he was in jail. He argues that the entire phone call is protected by the lawyer–client privilege and that intruding on that privilege amounted to a denial of his right to assistance of the counsel of his choice. As part of his arguments on appeal, he "anticipates" the counter-argument "that any complaint was waived on these issues because trial counsel failed to object at trial that these conversations were protected by the lawyer–client privilege."

Although in other contexts preserving error about the Sixth Amendment right to assistance of counsel is not subject to forfeiture, *see, e.g.*, *Corporon v. State*, 586 S.W.3d 550, 560 (Tex. App.—Austin 2019, no pet.) (citing *Saldano v. State*, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002)), when an appellant is challenging an admission of evidence purportedly in violation of the Sixth Amendment right to counsel, such a complaint *is* subject to forfeiture, *Darcy v. State*, 488 S.W.3d 325, 329–30 (Tex. Crim. App. 2016). Keen thus must have presented his complaint first to the trial court to have preserved it for appellate review. *See* Tex. R. App. P. 33.1(a)(1); *Burg v. State*, 592 S.W.3d 444, 448–49 (Tex. Crim. App. 2020) ("Rule 33.1 provides that a contemporaneous objection must be made to preserve error for appeal. Rule 33.1 applies to category-three 'forfeitable' *Marin* rights and requirements."); *Darcy*, 488 S.W.3d at 390 ("[T]he alleged error at issue in this case—the admission of evidence that was obtained in violation of the right to counsel—is of the type of claim that is forfeited by inaction.").

When the State offered the recording as evidence, Keen objected to certain parts of it. We reproduce below the content of the recording as the State offered it outside the presence of the jury. The part that we have italicized was excluded from evidence, but the rest of the recording was admitted:

Automated Voice: This call is subject to recording and monitoring. You may start the conversation now.

Keen's father: OK, hi Craig. Can you hear me?

Keen: Yeah. Were y'all allowed to clean anything in the house?

Keen's father: Oh, I've already cleaned it all up.

Keen: God.

Keen's father: I cleaned it up, uh, Sunday morning. I went by there and and and [sic] looked, and then, um, I told Margaret, I said, "You go take the girls, and y'all go somewhere and come back in two hours, and I'll get this mess cleaned up." And one of your neighbors—Dane somebody, three houses down with a little brick house on the left—he helped me clean the driveway, and I cleaned the the [sic] floor and everything. I got all that done. So what weapon was used? That .45?

Keen: I'm not talking about it.

Keen's father: OK, alright, uh—

Keen: You know the answer.

Keen's father: OK, and, uh—

Keen: It wasn't the .30-30, that's for sure.

Keen's father: Well, I I [sic] know you don't know—I I [sic] don't know what happened or why it happened, but but [sic] it's a tragedy.

Keen: I can't get into it.

Keen's father: Yeah, I know you can't. I know you can't.

*Keen: [inaudible]—what what [sic] the attorney said, it fits that parameter.*

*Keen's father: Yeah, that's what I'm saying.*

Keen: It's voluntary, not involuntary.

Keen made three objections: (1) the part of the call about cleaning the home is irrelevant; (2) the part about the weapon is irrelevant; and (3) his statement about "what the attorney said" plus his father's response, "Yeah, that's what I'm saying," are protected by the lawyer–client privilege.

9

Keen said that these were his three objections to the recording, and the trial court confirmed that understanding. The court overruled the relevance objections but sustained the objection about the lawyer–client privilege and so admitted the recording but excluded Keen's "attorney" statement and his father's response. Keen's privilege objection thus succeeded in the trial court—it led to the exclusion of the part of the recording (italicized above) to which the objection was addressed.

But Keen's argument on appeal is that the entire recording is protected by the lawyer–client privilege. He nowhere presented this argument to the trial court. His privilege objection concerned only some of the recording, the trial court confirmed that understanding of the objection, and Keen nowhere corrected that understanding. His arguments on appeal thus do not comport with his trial-court objection, so the objection did not preserve them for appellate review. *See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) ("[T]he point of error on appeal must comport with the objection made at trial."); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) ("[T]he point of error must correspond to the objection made at trial. In other words, 'An objection stating one legal theory may not be used to support a different legal theory on appeal.'" (internal citations omitted)). Without an objection to preserve his appellate complaint, Keen forfeited appellate review of his first, second, and third issues. *See* Tex. R. App. P. 33.1(a)(1); *Burg*, 592 S.W.3d at 448–49; *Darcy*, 488 S.W.3d at 330.

## II.     The record shows that the error about which Keen complains in his fourth and fifth issues did not happen.

Keen's fourth and fifth issues concern an audio–video recording of a different jail call between him and his father, which took place over the weekend between the first and second weeks of the guilt–innocence phase of this trial. He contends that the trial court erred by admitting

10

the recording into evidence because doing so violated his Sixth Amendment right to assistance of counsel (fourth issue) and Fifth Amendment right not to testify (fifth issue).

The record, however, shows that the recording was not admitted into evidence. When Keen was being cross-examined, the court held a hearing outside the jury's presence, during which the State played the recording for the trial court, revealing that the call involved discussion about Keen's trial strategy and conversations with his counsel. The State announced its intent to cross-examine Keen before the jury about these topics: whether he had in fact talked to his father over the previous weekend, whether they "discussed [a] change in strategy" for trial, "[w]hat initially was gonna be the focus of [Keen's] testimony," and what he had "changed it to, and why." In that context, the State "offer[ed] [the recording] for the record, just to provide the foundation of those questions" proposed for the cross-examination to follow. Keen made objections; the parties argued to the court; and the court, still outside the jury's presence, said that the recording "is admitted for record purposes only." It then sustained Keen's objection under the Fifth Amendment and so forbade the State from asking Keen about his "ability and decision not to testify or whether he's weighing whether to testify." It also ruled that the State could not "ask about anything the attorney said, unless we have to deal with the issue of waiver" of the lawyer–client privilege. It ended by overruling Keen's objection "concerning change of strategy by the defendant, other than based on what an attorney said," and recalled the jury to the courtroom. During the ensuing cross-examination, the prosecutor asked Keen questions in conformity with the court's rulings but did not play the recording for the jury or even seek to admit it.[2]

---

[2] The reporter's record's index of exhibits also shows that the recording was not used with the jury.

11

The record thus shows that the error about which Keen complains did not happen—the recording was not admitted into evidence. Keen thus has presented no error requiring correction, so we overrule his fourth and fifth issues.

### III. Keen was not egregiously harmed by the jury charge's erroneously allowing reckless aggravated assault to be the predicate felony for felony murder.

In his ninth issue, Keen contends that the charge erroneously allowed the jury to convict for murder using felony murder with a predicate felony of reckless aggravated bodily-injury assault. He argues that felony murder's statutory manslaughter exclusion extends to reckless aggravated bodily-injury assault because it is a lesser included offense of manslaughter.

We review a claim of charge error under a two-step framework. *Harmel v. State*, 597 S.W.3d 943, 956 (Tex. App.—Austin 2020, no pet.). We first determine whether the claimed error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Harmel*, 597 S.W.3d at 956. "[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *accord Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). Second, if there is error, we evaluate the harm caused by the error. *Ngo*, 175 S.W.3d at 743; *Harmel*, 597 S.W.3d at 956. The amount of harm needed for a reversal depends on whether the defendant preserved the error for review. *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If not preserved, as here, we may reverse only if the error caused "egregious harm." *Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

#### A. *Error in the charge*

Keen's indictment alleged all three legal theories of committing murder from Penal Code section 19.02(b): (1) intentionally or knowingly causing death, (2) intending to cause serious

bodily injury plus committing an act clearly dangerous to human life that causes death, and (3) felony murder. The court submitted all three theories to the jury, first defining relevant terms in abstract paragraphs and then using the theories, their elements, and other relevant terms in application paragraphs. The charge instructed the jury that although they may not convict for murder "unless you all agree that the State has proved beyond a reasonable doubt each element under [theory] 1 or each element under [theory] 2 or each element under [theory] 3," the jury did "not have to agree on which of the theories presented has been proved."

In the abstract paragraphs, the charge defined the three theories of murder and when defining felony murder instructed the jury that the predicate felony committed or attempted must be one "other than manslaughter." The charge then defined aggravated assault, listing its elements, and the definition allowed aggravated assault to be proven by intentional, knowing, *or reckless* conduct. The charge defined "intentionally," "knowingly," and "recklessly" in later abstract paragraphs. Then in the application paragraphs when the charge explained the felony-murder theory of committing murder, it defined the theory's elements as follows:

  a. *[whether Keen] committed or attempted to commit aggravated assault, and*

  b. while in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt to commit aggravated assault, he intentionally committed or attempted to commit an act clearly dangerous, shooting Erin Wright with a firearm, and

  c. caused the death of Erin Wright, and

  d. used or exhibited a deadly weapon, a firearm, during the commission of or immediate flight from this offense.

You are instructed that aggravated assault is a felony other than manslaughter.

13

(Emphasis added.) Thus when submitting felony murder, the charge did not differentiate between an aggravated assault committed intentionally or knowingly and one committed only recklessly. Keen's ninth issue turns on whether the charge was erroneous by allowing the jury to convict based on a predicate felony of aggravated bodily-injury assault committed only recklessly.

To support a murder conviction under a felony-murder theory, the predicate felony must be one "other than manslaughter." Tex. Penal Code § 19.02(b)(3). This statutory exclusion extends to lesser included offenses of manslaughter. *Lawson v. State*, 64 S.W.3d 396, 397 (Tex. Crim. App. 2001) (quoting *Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999)). Analyzing lesser included offenses for these purposes does not use the cognate-pleadings approach from the analysis of whether a requested lesser included offense should be submitted to a jury. *Fraser v. State*, 583 S.W.3d 564, 569 (Tex. Crim. App. 2019). Instead, to decide whether an offense is a lesser included offense of manslaughter for felony murder's statutory exclusion, we "look solely to the statutory elements of manslaughter" and those of the purported lesser included offense and ignore the indictment. *See id.*

Using this approach, we agree with Keen that reckless aggravated bodily-injury assault is a lesser included offense of manslaughter. When felony murder's predicate felony is aggravated assault, "[t]he culpable mental state matters . . . because the higher culpable mental state of intentional or knowing makes aggravated assault *not* a lesser-included offense of manslaughter." *Id.* at 570. But "when the defendant acts recklessly and causes serious bodily injury," that "version of aggravated assault *is* a lesser-included offense of manslaughter in the abstract." *Id.* Because reckless aggravated bodily-injury assault is a lesser included offense of manslaughter for felony murder's statutory manslaughter exclusion, reckless aggravated bodily-injury assault may not serve as the predicate felony for a felony murder. *See Lawson*,

14

64 S.W.3d at 397. But the charge here allowed for that possibility. Its application paragraphs allowed the jury to use aggravated assault as the predicate felony, the earlier abstract paragraphs defined aggravated assault as proven by reckless conduct, and nothing in the charge forbade the jury from using reckless aggravated bodily-injury assault as the predicate felony. Keen is thus correct that this aspect of the charge was erroneous.

### B.      Harm analysis

We therefore turn to a harm analysis. *See Ngo*, 175 S.W.3d at 743; *Harmel*, 597 S.W.3d at 956. Keen's eighth issue complains about the same error in the jury charge as his ninth does, but his argument there is that the indictment's mention of intentional or knowing aggravated assault when alleging felony murder precluded the charge from using reckless aggravated assault as the predicate felony. The "error" portion of Keen's eighth issue thus would lead to the same conclusion that we have already reached under his ninth issue, so both his eighth and ninth issues are resolved by the harm analysis that we undertake next.

Keen concedes "that he must show that he suffered egregious harm in order to have his conviction reversed" because "his trial counsel did not object to this error in the court's charge." That is indeed the case—there is no such objection in the record.

Egregious harm "is a difficult standard to meet and requires a showing that the defendant[] w[as] deprived of a fair and impartial trial." *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013). "The record must disclose 'actual rather than theoretical harm,' and the error must have affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory." *Id.* (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). "In determining whether egregious harm is shown, we look at the entire jury charge, the

15

state of the evidence (including the contested issues and the weight of probative evidence), the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id.*

"In a jury charge alleging alternative theories, harm must be measured 'at least in part, against the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability not affected by erroneous portions of the charge.'" *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012). "When a jury returns a general guilty verdict on an indictment charging alternate methods of committing the same offense, the verdict stands 'if the evidence is sufficient to support a finding under any of the theories submitted.'" *Id.* Thus, in the context of manners and means, even when a jury charge submits an erroneous manner and means for committing a single offense, if the evidence otherwise suffices to prove any of the alternative, non-erroneous manners and means submitted, the defendant is not harmed by the submission of the erroneous manner and means. *See id.* at 775–76. For cases, as here, in which both a valid and an invalid *legal* theory for an offense was submitted, when the valid theory is supported by "overwhelming evidence," the defendant often has not been egregiously harmed by submission of the invalid theory. *See Frost v. State*, 25 S.W.3d 395, 401 & n.11 (Tex. App.—Austin 2000, no pet.) (collecting such cases). This notion of overwhelming evidence is important, for a holding merely that the evidence was sufficient to convict under a valid legal theory does not by itself mean that a defendant was not egregiously harmed by submission of an invalid legal theory. *See Hollander v. State*, 414 S.W.3d 746, 751 (Tex. Crim. App. 2013) ("In an egregious-harm analysis, the question is not simply whether, when viewed in the light most favorable to the verdict, the jury *could* rationally have found predicate facts to a level of confidence beyond a reasonable doubt.

16

Instead, a reviewing court must evaluate the likelihood, considering the record as a whole, that a properly instructed jury *would* have found the predicate facts to the requisite level of confidence.").

### 1.     *The entire jury charge*

The jury charge otherwise properly instructed the jury on the circumstances under which it could convict Keen of murder.  It defined the three theories of murder in the abstract and applied them to the evidence.  Those definitions and applications tracked the statutory language and were sufficiently raised by the evidence.  The charge also defined and submitted lesser included offenses sought by Keen—manslaughter and criminally negligent homicide—and self-defense.  Thus, if the jury believed Keen or if it had any reasonable doubt about the State's evidence, the jury had several proper avenues available to it short of convicting for murder, including acquittal.  Further, the jury could convict for murder without needing to agree on which of the three legal theories submitted was proven beyond a reasonable doubt, as properly instructed in the charge.  This meant that the jury need not have confronted the reckless-aggravated-assault error in the felony-murder theory.  *Cf. Sanchez*, 376 S.W.3d at 775 ("Although erroneously permitting the jury to find appellant guilty for causing the decedent's death by unknown manner and means, the jury could have convicted appellant for murder without being unanimous in its determination as to the manner or means of death.").  The charge in its entirety therefore does not support egregious harm.

### 2.     *The state of the evidence, including the contested issues and the weight of the probative evidence*

Crucially, the evidence that supported convicting for murder under any of the valid legal theories submitted was overwhelming.  The evidence supported findings either that Keen (1) knowingly caused Wright's death, (2) intended to cause her serious bodily injury and

17

committed an act clearly dangerous to human life that caused her death, or (3) committed knowing aggravated assault and in the course of the commission also committed an act clearly dangerous to human life that caused her death. *See* Tex. Penal Code § 19.02(b)(1)–(3). Such findings were supported by four sets of inferences drawn from the evidence.

First, Keen's history of assaulting and hating Wright tended to show that he knowingly harmed her on Easter 2016. The earlier assault while she was pregnant, the attendant destruction of their home, and Keen's comments over the years to his close friend all show a person capable and willing—even eager—to seriously hurt Wright. Keen, in his friend's words, "despised" Wright and thought her "the devil's spawn." In much the same vein, he saw himself as a tool for carrying out divine destruction and so thought that Wright's death was "good" and "OK." He had threatened people many times, so much so that his friend had some concern for Wright's and the children's safety. He also once brought himself to the threshold of killing Wright by retrieving and "rais[ing]" the shotgun, and that episode so concerned his friend that the friend recommended getting rid of every weapon in the home. This Keen did not do, instead keeping in the kitchen a handgun with a round already chambered.

Second, the evidence showed that Keen knowingly aimed the gun at Wright. He admitted that until just before the moment of firing, he was aiming the gun at her. Abby, standing right next to her mom, saw Keen aim the gun at Wright. His skill with guns was revealed through effective cross-examination. The prosecutor elicited from him that he started using guns at nine years old and had shot guns "[t]housands of times." He learned how from his father, an Air Force veteran. Keen volunteered that he regularly used a .22, long rifle to kill snakes, which, he admitted, meant that he "ha[d] to have [been] a pretty good shot." Perhaps proud of his skills, he proclaimed, "I'm an excellent shot." Despite his skill with guns, he sought to have the jury believe that he was

18

really aiming the gun above Wright simply to warn her and that he killed her only because of the bullet's coming "down from a sharp angle." Nonsense, the jury reasonably could have thought. It had evidence before it that Keen knew what he was doing when he aimed and fired that gun.

Third, and dovetailing with parts of the previous topic, the evidence allowed the jury reasonably to conclude that Keen was conscious of his guilt. *See Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd) (defendant's lying about facts underlying offense shows consciousness of guilt); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (consciousness of guilt "is perhaps one of the strongest kinds of evidence of guilt" and is "a circumstance tending to prove that [defendant] committed the act with which he is charged"). He, by his own testimony, put himself in conflict with several witnesses. Not only did he dispute with Abby about whether he had aimed the gun at Wright, but he also said that officers planted evidence and unlawfully altered a crime scene and that his erstwhile close friend lied during much of his testimony. Keen said that a "personal vendetta" led the friend to lie in his testimony about the shotgun and that the friend was "randomly" making it up and perjuring himself "for no reason." Keen offered similar explanations for why the friend testified that Keen thought himself a "vessel of destruction" and declared that Wright was a "dead woman walking." Given all this, the jury could have reasonably believed that Keen was lying. *See Bustamante v. State*, 106 S.W.3d 738, 741 (Tex. Crim. App. 2003) (jury may disbelieve "self-serving" statements); *Couchman*, 3 S.W.3d at 163–64; *Torres*, 794 S.W.2d at 598. The prosecutor also elicited from him that he did not want Leah to meet with prosecutors. Efforts to conceal evidence also show consciousness of guilt. *See Torres*, 794 S.W.2d at 598–99. Evidence of Keen's consciousness of guilt thus supported the jury's verdict.

Fourth, the evidence disproved that Wright used or attempted to use deadly force. *See* Tex. Penal Code § 9.32(a)(2)(A). Keen admitted that at no point did she strike him or have a deadly weapon, meaning that his much larger size made it unlikely that she could threaten him with serious injury without a weapon. His explanations for why he felt threatened enough to fetch a gun and aim it at Wright amounted to her yelling at him and invading his personal space. He admitted retrieving the gun and pointing it at her before she threw anything at him after his retreat to the kitchen. Abby, who saw everything in the kitchen unfold, said that at no point was Keen afraid of Wright. Several witnesses saw no injuries on him, nor did several others ever hear him say that he thought his life had been in danger. The one injury that the jury saw, the shallow ankle cut, had been caused by a broken-plate shard that someone like the police must have hidden away, according to Keen. The jury thus reasonably could have disbelieved that the ankle cut had anything to do with Wright. Because the evidence supported proof beyond a reasonable doubt that Wright did not use or attempt to use deadly force, the jury reasonably could have found that self-defense did not apply and that Keen knowingly caused a non-threatening Wright serious bodily injury.

Taken together, these four sets of inferences supplied the jury with overwhelming evidence to convict Keen of murder under several of the legally valid theories submitted. *See Sanchez*, 376 S.W.3d at 775–76; *Frost*, 25 S.W.3d at 401 & n.11. Specifically, they allowed the jury to consider Keen's death-causing or injury-causing conduct to have been carried out knowingly and so reject his having been only reckless. Rejecting recklessness meant that the jury would not have confronted the error in the charge.

Keen raises a part of the forensic pathologist's testimony to argue that the evidence of recklessness was actually much stronger. The forensic pathologist confirmed that "most people would think that you could shoot someone in the shoulder and they would be OK." But this fact

20

does not fit with Keen's story. He testified that he was aiming over and past Wright, not at her shoulder, and the evidence showed that the bullet hit her chest near her neck, albeit also near her left shoulder. And though Abby testified that Wright tried to get out of the way of the shot, no evidence supported an inference that Wright jumped upward to do so. Thus, and given Keen's skill with guns, the jury would have discounted any shoulder-aiming here: he was aiming either entirely above Wright, but the bullet then traveled downward at a sharp angle anyway, or directly at her, and the jury would have believed that it was at her.

In all, we view the overwhelming state of the evidence as weighing heavily against any egregious harm. *See Sanchez*, 376 S.W.3d at 775 ("'[T]he presence of overwhelming evidence of guilt plays a determinative role in resolving the issue' and may be considered when assessing jury-charge error.").

### 3. Arguments of counsel and other relevant information revealed by the record

After reviewing the closing arguments, we find nothing that emphasized the error in the charge. Indeed, the prosecutors argued that the evidence was overwhelming that Keen had knowingly caused Wright's death. And they downplayed recklessness by arguing that the evidence of knowing conduct prevented the jury from convicting for manslaughter.

After reviewing the entire record, we conclude that the charge error did not deprive Keen of a fair and impartial trial, affect the very basis of the case, deprive him of any valuable right, or vitally affect his defensive theories. *See Nava*, 415 S.W.3d at 298. We therefore hold that the charge error did not egregiously harm him and overrule his eighth and ninth issues.

21

**IV.     Keen did not preserve his complaints about two other recordings of jail calls.**

Keen's sixth and seventh issues concern the punishment phase of trial and two more audio–video recordings of jail calls between him and his father.  He argues, like in his first three issues, that admitting these recordings during punishment violated his Sixth Amendment right to assistance of counsel because the calls were protected by the lawyer–client privilege.  Yet there is no such objection in the record.  When the State offered the recordings, Keen objected to their relevance and also argued that their unfair prejudice outweighed their probative value, but there was no mention of the Sixth Amendment, the lawyer–client privilege, or anything comporting with his appellate complaints.  Keen therefore forfeited appellate review of his sixth and seventh issues. *See* Tex. R. App. P. 33.1(a)(1); *Burg*, 592 S.W.3d at 448–49; *Darcy*, 488 S.W.3d at 330.[3]

**CONCLUSION**

We affirm the trial court's judgment.

_____
Chari L. Kelly, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed:   October 15, 2021

Do Not Publish

---

[3] In his appellate arguments about his jail-call issues, Keen several times raises *Satterwhite v. Texas*, 486 U.S. 249 (1988), to argue that Sixth Amendment violations that pervade an entire trial can never be harmless.  We need not reach this argument because we have not resolved any of his Sixth Amendment issues by a harm analysis.